**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ATLANTIC CITY MUNICIPAL UTILITIES AUTHORITY;<br><br>                Plaintiff,<br><br>           v.<br><br>3M COMPANY, E.I. DU PONT DE NEMOURS & COMPANY, THE CHEMOURS COMPANY, TYCO FIRE PRODUCTS LP, CHEMGUARD INC., BUCKEYE FIRE EQUIPMENT COMPANY, NATIONAL FOAM, INC., and FEDERAL AVIATION ADMINISTRATION,<br>                Defendants. | Case No.<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

## TABLE OF CONTENTS

I.      Introduction .................................................................................................................... 1

II.     Parties ............................................................................................................................ 3

III.    Jurisdiction and Venue ................................................................................................. 6

IV.     Factual Allegations ....................................................................................................... 6

    A.  PFOA and PFOS: Their Chemical Characteristics, Risks, and
        Regulatory Standards .......................................................................................... 6

    B.  Manufacturing Defendants' Production and Commercialization of AFFF .............. 8

    C.  Manufacturing Defendants' Knowledge of Threats Posed by Their
        AFFF Products .................................................................................................... 9

    D.  PFOA and PFOS Contamination of ACMUA's Water Supplies ........................... 13

    E.  ACMUA Is Injured ............................................................................................ 14

V.      Causes of Action ......................................................................................................... 15

    FIRST CAUSE OF ACTION
    Strict Products Liability for Defective Design ................................................................. 15

    SECOND CAUSE OF ACTION
    Strict Products Liability for Failure to Warn .................................................................... 18

    THIRD CAUSE OF ACTION
    Negligence ..................................................................................................................... 21

    FOURTH CAUSE OF ACTION
    Trespass ......................................................................................................................... 23

    FIFTH CAUSE OF ACTION
    Private Nuisance ............................................................................................................. 24

    SIXTH CAUSE OF ACTION
    Recovery of CERCLA Response Costs ........................................................................... 25

VI.     Prayer .......................................................................................................................... 26

VII.    Jury Demand ............................................................................................................... 28

Plaintiff Atlantic City Municipal Utilities Authority ("ACMUA"), a public drinking water provider having its principal office at 401 North Virginia Avenue, Atlantic City, in the County of Atlantic, State of New Jersey, by and through its attorneys, files this Complaint against the above-named defendants and alleges as follows:

## I.   Introduction

1.      ACMUA brings this action to recover the substantial costs necessary to protect the public and restore its damaged drinking water supply wells from exposure to and contamination with toxic per- and poly-fluroalkyl substances ("PFAS"), including, but not limited to, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS"), from products made, marketed, or used by Defendants.[1]

2.      Defendants 3M Company, E.I. DuPont de Nemours and Company, The Chemours Company, Tyco Fire Products LP (successor-in-interest to Ansul Co.), Chemguard Inc., Buckeye Fire Equipment Company, and National Foam, Inc. (collectively, "Manufacturing Defendants"), manufactured, marketed, sold, and/or promoted aqueous film-forming foams ("AFFF"), firefighting products used on flammable liquid fires, which contained PFAS or other telomer compounds that can break down into PFOA and other PFAS ("AFFF products").

3.      Manufacturing Defendants' AFFF products were used and disposed of into the environment by Defendant Federal Aviation Administration ("FAA") at the William J. Hughes Technical Center ("Technical Center"), which the FAA owns and operates, causing PFAS contamination. Among other things, Manufacturing Defendants' AFFF products were used by the FAA at the Technical Center during the course of FAA firefighting training exercises. The resulting contamination has now migrated from the Technical Center into ACMUA's raw water

---

[1] ACMUA reserves its right to bring additional claims should it incur injuries attributable to the presence of other PFAS in its wells.

supply.

4.      PFOA and PFOS are toxic, not easily biodegradable, persistent in the environment, and pose a significant risk to human health and safety. PFOA and PFOS are associated with a variety of illnesses, including cancer, and considered particularly dangerous to pregnant women and young children.

5.      Manufacturing Defendants knew or should have known that PFOA and PFOS are highly soluble in water; extremely mobile; persistent; very likely to contaminate surface and groundwater, including drinking supplies; and present significant risks to human health and welfare if released to the environment.

6.      Nonetheless, Manufacturing Defendants manufactured, marketed, sold, and/or promoted AFFF products that either contained PFOA and/or PFOS or would degrade into PFOA or PFOS. Manufacturing Defendants had knowledge that those compounds would be discharged to the land and water during firefighting training and rescue exercises and in firefighting emergencies, among other normal and foreseeable uses. It was reasonably foreseeable that these AFFF products would be used by the FAA at the Technical Center, and that those products would contaminate ACMUA's wells.

7.      ACMUA files this lawsuit to recover compensatory damages and all other available remedies, including, but not limited to, all necessary funds to reimburse ACMUA for the costs of designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFOA and PFOS from its drinking water wells, and all associated costs and damages, and to ensure that the parties responsible for the drinking water contamination bear these expenses, rather than ACMUA and its ratepayers.

2

## II.    Parties

8.    **Plaintiff Atlantic City Municipal Utilities Authority ("ACMUA")** provides drinking water for Atlantic City, which is located on Absecon Island in Atlantic County. ACMUA's main facilities include: two surface water reservoirs (Kuehnle Pond Dam and Doughty Pond Dam) with a combined capacity of approximately 500 million gallons; twelve groundwater wells with depths ranging from 200 to 675 feet; three water towers with a combined capacity of more than 9 million gallons; the Pleasantville Water Treatment Plant; and over 150 miles of water transmission lines. Nine of ACMUA's wells are located on FAA property at the Technical Center.

9.    ACMUA is a "person," as that term is defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), that has incurred and continues to incur necessary costs of "response," as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

10.    **Defendant 3M Company** ("3M") is a Delaware corporation with its principal place of business in St. Paul, Minnesota. 3M does business throughout the United States, including in this District. 3M manufactured, marketed, promoted, distributed, and/or sold AFFF products containing PFOA and/or PFOS or which degraded into PFOA and/or PFOS. 3M's AFFF products were used at the Technical Center and released into the environment.

11.    **Defendant E.I. du Pont de Nemours & Company** ("DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware. DuPont does business throughout the United States, including in this District. Dupont manufactured, marketed, promoted, distributed, and/or sold AFFF products containing PFOA and/or PFOS or which degraded into PFOA and/or PFOS. Dupont's AFFF products were used at the Technical Center and released into the environment.

12.    **Defendant The Chemours Company** ("Chemours") is a Delaware corporation

3

with its principal place of business in Wilmington, Delaware. In 2015, DuPont spun off its "performance chemicals" businesses, including its fluoroproduct business, to Chemours. Chemours assumed the operations, assets, and certain limited liabilities of DuPont's performance chemical business. Additionally, DuPont and Chemours have agreed to share liabilities for claims arising from PFOA contamination arising from at least some of DuPont's former manufacturing sites.

13.    **Defendant Tyco Fire Products, LP** ("Tyco") is a Delaware limited partnership, with its principal place of business in Marinette, Wisconsin. Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul"), a corporation organized under the laws of Wisconsin (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul"). AFFF products manufactured or marketed by Tyco and/or Ansul contain or degrade into PFOA and/or PFOS, were used at the Technical Center, and released into the environment.

14.    **Defendant Chemguard Inc.** ("Chemguard") is a Wisconsin corporation with its principal place of business in Marinette, Wisconsin. At all times relevant, Chemguard manufactured, marketed, promoted, distributed, and/or sold AFFF and/or other fluorinated products that contain or degrade to PFOA and/or PFOS. AFFF products manufactured or marketed by Chemguard were used at the Technical Center and released into the environment.

15.    **Defendant Buckeye Fire Equipment Company** ("Buckeye Fire") is a North Carolina corporation with its principal place of business in Mountain, North Carolina. At all times relevant, Buckeye Fire manufactured, marketed, promoted, distributed, and/or sold AFFF and/or other fluorinated products that contain or degrade to PFOA and/or PFOS. AFFF products manufactured or marketed by Buckeye Fire were used at the Technical Center and released into

4

the environment.

16.     **Defendant National Foam, Inc**., also known as Chubb National Foam (collectively "National Foam"), is a Delaware corporation with its principal place of business in West Chester, Pennsylvania. National Foam manufactures the Angus brand of products and is successor-in-interest to Angus Fire Armour Corporation, a corporation organized under the laws of Delaware. At all times relevant, National Foam manufactured, marketed, promoted, distributed, and/or sold AFFF and/or other fluorinated products that contain or degrade to PFOA and/or PFOS. AFFF products manufactured or marketed by National Foam were used at the Technical Center and released into the environment.

17.     **Defendant Federal Aviation Administration** owns and operates the Technical Center. In the 1940s, the Atlantic City Municipal Airport and a U.S. Naval Air Station ("NAS") were established at the site of the Technical Center. By May 1944, approximately 3,500 Navy personnel were based at the site. In 1958, the Naval facility was transferred to the Airways Modernization Board ("AMB") and the installation was designated the National Aviation Facilities Experimental Center ("NAFEC"). In 1958, the FAA (then the Federal Aviation Agency) was established and took over the operations of the AMB, including NAFEC. Over the last several decades, the FAA conducted fire-fighting drills at the Technical Center using AFFF products made and/or marketed by the Manufacturing Defendants.

18.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties,

employment, or agency.

19.     All references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

**III.     Jurisdiction and Venue**

20.     This Court has jurisdiction to hear this matter under 28 U.S.C. §§ 1331 and 1332 and 42 U.S.C. § 9613(b).

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 9613(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District, and a substantial part of the property that is the subject of the action is situated here. Specifically, the disposal and release of the hazardous substances occurred in this District, and the damages occurred in this District. In addition, the Defendants conduct and/or have conducted business in this District.

22.     Federal Defendant FAA has waived its sovereign immunity pursuant to CERCLA § 120(a)(1), 42 U.S.C. § 9620(a)(1).

**IV.     Factual Allegations**

      **A.     PFOA and PFOS: Their Chemical Characteristics, Risks, and Regulatory Standards**

23.     PFAS are a family of chemical compounds containing fluorine and carbon atoms. PFAS have been used for decades to produce household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant. The PFAS family of chemicals is entirely manmade and does not occur in nature. PFOA and PFOS are among the most toxic chemicals in the PFAS family.

24.     PFOA and PFOS have characteristics that cause extensive and persistent environmental contamination. Specifically, they are (1) mobile—that is, because they are soluble

6

and do not adsorb (stick) to soil particles, and they are readily transported through the soil and into groundwater where they can migrate long distances; and (2) persistent—that is, they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water. In short, once PFAS are applied, discharged, disposed of, or otherwise released onto land or into water, those compounds migrate through the environment and into groundwater, resist natural degradation, and are difficult and costly to remove.

25.     PFOA and PFOS bioaccumulate and biomagnify in people and other organisms.

26.     Scientists link PFOA and PFOS with a wide range of serious public health impacts, including kidney and testicular cancer, thyroid disease, ulcerative colitis, high cholesterol, pregnancy induced hypertension, and low birth weight.

27.     PFOA and PFOS contamination presents a serious threat to public health through drinking water.

28.     In April 2019, the New Jersey Department of Environmental Protection ("DEP") formally proposed health-based drinking water standards for PFOA and PFOS. Under the Rules, the DEP proposes maximum contaminant levels ("MCL") of 14 parts per trillion ("ppt") for PFOA and 13 ppt for PFOS. DEP is now taking public comment on the proposed rules and will hold a public hearing on May 15, 2019. The establishment of the health-based MCLs triggers certain State regulatory requirements governing ACMUA's wells and operations; in some circumstances action is required even if current levels contamination levels are below the MCL to protect against MCL exceedances. Such State requirements include, but are not limited to, required investigatory and remedial action by public water suppliers to protect public health, including by taking action to remove PFAS contamination from water in its wells.

29.     PFOA and PFOS can be responded to as pollutants under the Comprehensive

7

Environmental Response, Compensation and Liability Act.

      **B.**    **Manufacturing Defendants' Production and Commercialization of AFFF**

      30.    AFFFs are synthetically formed by combining fluorine-free hydrocarbon foaming agents with highly fluorinated surfactants. When mixed with water, a solution forms producing aqueous film that spreads across the surface of a hydrocarbon fuel. This film formation feature is what provides the fire extinguishment.

      31.    In the 1960s, 3M began developing firefighting foams containing PFOA to suppress flammable liquid fires. In the early 1970s, 3M began producing solely PFOS-based AFFF.

      32.    Tyco, Chemguard, Buckeye, and National Foam entered the AFFF business at various times since the early 1970s. These Defendants used a process called telomerization to produce the fluorinated surfactants contained in their firefighting foams. Telomer-based foams do not contain or degrade into PFOS, and are not made with PFOA, but may contain those compounds as impurities from the manufacturing process. These telomer-based foams contain other PFAS, and are therefore distinguishable from 3M-produced AFFF.

      33.    After its creation in the 1960s AFFF was widely used across the country.

      34.    AFFF users, including the FAA, have long conducted exercises, including firefighting and explosion training, where AFFF was sprayed directly on the ground, as Manufacturing Defendants instructed, which allowed PFAS to travel to surrounding surface water, sediment, and groundwater.

      35.    Some federal and/or federally-regulated facilities purchased AFFF manufactured to military specifications, known as "Milspec." AFFF Milspec sets out only performance specifications, not manufacturing or production specifications. While Mil-Spec calls for a "fluorinated surfactant," there are thousands of such compounds.

36.    Milspec specifications do not govern or apply to the general formulation and sale of AFFF sold for commercial use. As such, Milspec did not and does not apply to any commercial transactions involving AFFF that do not involve either the military or a federally-regulated airport.

## C.    Manufacturing Defendants' Knowledge of Threats Posed by Their AFFF Products

37.    For more than 50 years, Manufacturing Defendants were or should have been aware of the dangers posed to people by exposure to their AFFF products (including via drinking water); and that the production and use of AFFF products resulted in the release of PFOA and PFOS to the environment. Despite this knowledge, Manufacturing Defendants failed to adequately investigate and test their products to ensure they would not cause harm to the public; and continued their AFFFF production and marketing practices without eliminating the defects in their products, and without warning of the known dangers of their products. These measures could have eliminated or reduced damage and injuries to ACMUA's drinking water production wells.

38.    By 1956, 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

39.    3M was informed as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped into landfills could leach into groundwater and otherwise enter the environment. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

40.    DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

41.    As early as 1963, 3M was aware that its PFAS products were stable in the

9

environment and would not degrade after disposal.

42.    By the 1970s, 3M had become concerned about exposure to fluorochemicals in the general population.

43.    By at least 1970, 3M was aware that its PFAS products were hazardous to marine life. One study of 3M fluorochemicals around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

44.    In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States. Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that their products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company. This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the absorption of PFOA in blood from 3M's products.

45.    As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about PFAS's health effects.

46.    Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS. DuPont was aware of 3M's findings no later than 1981.

47.    Also in 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to C8, DuPont initiated a plan to review and monitor the health conditions of potentially-exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

48.    In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River.

49.    According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals. At the time of the specialist's resignation in 1999, that resistance had not ceased.

50.    In 1981, DuPont was informed that ingestion of PFOA caused birth defects in rats but continued manufacturing the chemical and failed to disclose the study results.

51.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

52.    DuPont was long aware it was releasing from its facilities PFAS that were leaching into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near DuPont facilities in West Virginia and Ohio, DuPont in 1984 held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting"). DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials capable of eliminating additional PFOA releases from its operations. DuPont chose not to use either, despite knowing of PFOA's toxicity.

53.    During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA

11

issue as "one of corporate image, and corporate liability." They discussed DuPont's "incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation." They also stated that "legal and medical will likely take the position of total elimination" of PFOA use, and had "no incentive to take any other position."

54.     In 1984, 3M's internal analyses demonstrated that that fluorochemicals were likely bioaccumulating in 3M fluorochemical employees.

55.     By at least 1993, Manufacturing Defendants were aware that PFAS was linked to increased cancer rates in humans exposed to their PFOA products. 3M memos show that in 1993, it worked to change the wording in studies by a Dr. Gilliland, who around that time published a paper demonstrating a 3.3-fold increase in mortality rates for workers employed in jobs that exposed them to PFOA.

56.     Despite its understanding of the hazards associated with its PFAS products, 3M actively sought to suppress scientific research on the hazards associated those products, and mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health and ecological risks of its PFAS products. At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFCs] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

57.     In response to pressure from the EPA, 3M began to phase out production of PFOS and PFOA products in 2000. On May 16, 2000, 3M issued a news release falsely asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production. On the same day as 3M's phase out announcement, an EPA internal email stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human

and animal tissues and could potentially pose a risk to human health and the environment over the long term." The author further stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

58.    All Defendants knew or should have known that in their intended and/or common use, their AFFF products would very likely injure and/or threaten public health and the environment. This knowledge was accessible to all Defendants.

**D.    PFOA and PFOS Contamination of ACMUA's Water Supplies**

59.    Use of AFFF in fire suppression and fire-fighting training activities by the FAA at the Technical Center is the major source of PFAS releases into the environment and ACMUA's water supply.

60.    For decades, Manufacturing Defendants did not warn AFFF users of PFOA and PFOS's existence in AFFF, the hazards associated with PFOA and PFOS in AFFF, or the mobility and persistence of PFOA and PFOS released to the environment when AFFF was used as instructed by Defendants by spraying it directly on the ground during fire training exercises. The use of AFFF to extinguish fires allowed PFOA and PFOS to escape into the ground and migrate to surrounding public and private drinking water wells. As such, sites where AFFF was used, including fire training areas, sites of past emergency response incidents, airports, and other areas where AFFF has been stored and accidentally released, are substantial contributors to PFOA and PFOS contamination. Throughout the time AFFF containing PFOA and PFOS have been used, the instructions, warning labels, and material safety data sheets that were provided with the AFFF by the Manufacturing Defendants did not fully identify and notify customers, users, regulators, public water suppliers, or the public concerning the health and environmental hazards of AFFF, of which Manufacturing Defendants knew or should have known.

13

61.     There are several known AFFF release sites near ACMUA's wells that likely contributed to the release of PFAS and consequent contamination of ACMUA's wells, including but not limited to the following:

a.  From through 1970s through 1988, the FAA ignited and extinguished fires using AFFF at a former fire training area at the Technical Center known as Area 29.

b.  The FAA performed AFFF testing in an asphalt and grassy area outside of the former fire and crash station at the Technical Center.

c.  The FAA conducted fire training exercises at Area Q of the Technical Center from 1976 to 1984.

d.  An AFFF fire suppression system was installed in several Hangar Buildings at the Technical Center, including buildings 301, 350, 501, and 503, and AFFF was discharged from those systems on a number of occasions.

e.  The Air Blast Test Area of the Technical Center has been used for 30 to 40 years to conduct demonstrations and observations using firefighting products, including AFFF.

62.     These and other AFFF discharges at the Technical Center by the FAA caused contamination of the ACMUA's water supply, including the water in ACMUA's nine wells at the Technical Center.

**E.     ACMUA Is Injured**

63.     PFOA and PFOS have been detected in varying amounts at varying times in the ACMUA's wells at the Technical Center. A substantial portion of those wells have tested above the proposed MCL for PFOA, and at levels approaching and in some cases exceeding the proposed

14

MCL for PFOS. An additional, substantial portion of ACMUA's wells exceed levels that are injurious, including because regulatory standards require actions at levels below MCLs. In addition, PFOA and PFOS's high mobility and persistence in soil and groundwater means they will likely continue to spread and affect even more of ACMUA's wells in the future.

64.    Manufacturing Defendants' AFFF products and FAA's use of those products are the major sources of the PFOA and PFOS released to the environment that ultimately reached groundwater that supplies ACMUA's production wells. PFOA and PFOS have reached those wells due to the routine, foreseeable, and intended use and disposal of Manufacturing Defendants' AFFF products in the vicinity of locations from which ACMUA obtains water, including its groundwater wells, and source sites for imported water.

65.    ACMUA's current water treatment system is unable to permit compliance with New Jersey's recently proclaimed—and anticipated—new MCL for PFAs. The system will require substantial, costly upgrades to do so. The FAA has stated it will not provide any monetary assistance to address these issues.

66.    The most viable technologies to remove PFAS compounds from drinking water are granular activated carbon treatment ("GAC"), reverse osmosis, electrochemical oxidation, and anion exchange. Each of these technologies is extremely expensive to build, install, operate and maintain.

V.    **Causes of Action**

**FIRST CAUSE OF ACTION**
**Strict Products Liability for Defective Design**
**(Against the Manufacturing Defendants)**

67.    ACMUA realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

68.    As manufacturers and/or sellers of AFFF products, Manufacturing Defendants had a strict duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses, and owed that duty both to reasonably foreseeable users of those products and to any person who might reasonably be expected to come into contact with those products.

69.    Manufacturing Defendants knew that third parties would purchase AFFF products and use them without inspection for defects.

70.    AFFF products purchased or otherwise acquired (directly or indirectly) from Defendants by third parties, including the FAA, were applied, discharged, disposed of, or otherwise released onto lands and/or waters. Such discharges occurred at various locations, including at the Technical Center, at various times, and in various amounts. PFOA and PFOS resulting from such discharges moved through the environment and did not degrade, and eventually contaminated ACMUA's wells.

71.    The AFFF products purchased by third parties, including the FAA, were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

72.    Manufacturing Defendants knew or reasonably should have known that the use of their AFFF products in an intended or reasonably foreseeable manner would result in the spillage, discharge, disposal, or release of PFOA and PFOS onto land or into water such that PFOA and PFOS foreseeably contaminated ACMUA's wells.

73.    The AFFF products that are injuring ACMUA's wells are defective in design and unreasonably dangerous because, among other things:

    a.    They contain or degrade into PFOA and/or PFOS.

b.   PFOA and PFOS cause extensive and persistent contamination when they, or products containing them, are used in a reasonably foreseeable or intended manner.

c.   PFOA and PFOS contamination in groundwater and surface water that are the sources of drinking water poses significant threats to public health and welfare.

d.   Manufacturing Defendants failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential ecological and human health effects of AFFF products.

74.    At all times relevant to this action, the AFFF products were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and the foreseeable risk of harm to public health and welfare via drinking water contamination posed by the AFFF products outweighed the cost to Manufacturing Defendants of reducing or eliminating such risk.

75.    Manufacturing Defendants knew or should have known about reasonably safer feasible alternatives to AFFF products, and the omission of such alternative designs rendered Defendants' products not reasonably safe.

76.    As a direct and proximate result of the defects previously described, ACMUA's wells became contaminated with PFOA and PFOS in varying amounts over time, causing ACMUA significant injury and damage.

77.    As a direct and proximate result of Manufacturing Defendants' acts and omissions as alleged herein, ACMUA has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its wells in an amount to be proved at trial.

17

78.    Manufacturing Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of ACMUA's wells. Manufacturing Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Manufacturing Defendants knew for decades of the dangers posed by their products. Therefore, ACMUA requests an award of punitive damages for Manufacturing Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. ACMUA requests an award of punitive damages in an amount sufficient to punish these Manufacturing Defendants and that fairly reflects the aggravating circumstances alleged herein.

## SECOND CAUSE OF ACTION
### Strict Products Liability for Failure to Warn
### (Against Manufacturing Defendants)

79.    ACMUA realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

80.    As manufacturers and/or sellers of AFFF products, Manufacturing Defendants had a strict duty to ACMUA to warn users of those products of the foreseeable harms associated with those products.

81.    Manufacturing Defendants inadequately warned users and buyers of their AFFF products of the likelihood that their products would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases. To the extent Manufacturing Defendants provided warnings about their products, such warnings did not convey a fair indication of the nature and extent of the hidden dangers of Manufacturing Defendants' products to the mind of a reasonable user, because, among other things, they lacked descriptions

18

of the nature and extent of the contamination of drinking water production wells that resulted from those products. Indeed, despite Manufacturing Defendants' own unique knowledge of such hazards, they elected to withhold such knowledge from ACMUA, regulators, and the public; to affirmatively distort and/or suppress their knowledge and the scientific evidence linking their products to such hazards; and to instruct users to release their products directly to the ground where PFOA and PFOS therein could infiltrate drinking water supplies.

82.     Manufacturing Defendants failed to warn of the hidden dangers associated with their AFFF products before those products left their control, and at all stages of the chain of commerce; at no time relevant to this Complaint did Manufacturing Defendants warn that their products would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases.

83.     Manufacturing Defendants' AFFF products purchased by third parties, including the FAA, were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

84.     AFFF products purchased or otherwise acquired (directly or indirectly) from Manufacturing Defendants by third parties, including the FAA, were applied, discharged, disposed of, or otherwise released at various locations, including at the Technical Center, at various times, and in various amounts onto the lands and/or water that are pathways to the groundwater that supplies ACMUA's drinking water production wells.

85.     Manufacturing Defendants knew or should have known that the use of AFFF products in their intended manners would result in the discharge, disposal, or release of PFOA and PFOS onto land or into water, such that PFOA and PFOS would contaminate drinking water supplies.

19

86.    The AFFF products were used and disposed of in a manner that caused contamination in ACMUA's wells, and they were defective in design and unreasonably dangerous products for the reasons set forth above.

87.    ACMUA's wells reasonably should have been expected to come into contact with PFOA and PFOS from Manufacturing Defendants' products.

88.    Had Manufacturing Defendants provided adequate warnings about the hazards associated with their AFFF products, third party users, including the FAA, would have heeded that warning.

89.    As a direct and proximate result of Manufacturing Defendants' failure to warn of the hazards of their AFFF products that were, or reasonably should have been, known to them, ACMUA's wells are contaminated with PFOA and PFOS.

90.    As a direct and proximate result of Manufacturing Defendants' acts and omissions as alleged herein, ACMUA has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its wells in an amount to be proved at trial.

91.    Manufacturing Defendants knew it was substantially certain that their acts and omissions described herein would cause injury and damage, including PFOA and PFOS contamination of ACMUA's wells. Manufacturing Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Manufacturing Defendants knew for decades of the dangers posed by their products. Therefore, ACMUA requests an award of punitive damages for Manufacturing Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. ACMUA requests an award

20

of punitive damages in an amount sufficient to punish these Manufacturing Defendants and that fairly reflects the aggravating circumstances alleged herein.

## THIRD CAUSE OF ACTION
### Negligence
### (Against Manufacturing Defendants)

92.     ACMUA realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

93.     As manufacturers of AFFF products, Manufacturing Defendants owed a duty to ACMUA to warn buyers and users of their AFFF products of the hidden dangers associated with release to the environment of PFOA and PFOS in those products.

94.     Manufacturing Defendants breached this duty by inadequately warning users and buyers of their AFFF products of the likelihood that their products would cause PFOA and PFOS to be released to the environment during their normal, intended and foreseeable use, and of the widespread, toxic, and persistent effects of such releases. To the extent Manufacturing Defendants provided warnings about their products, such warnings did not convey a fair indication of the nature and extent of the hidden dangers of Manufacturing Defendants' products to the mind of a reasonable user, because, among other things, they lacked descriptions of the nature and extent of the contamination of drinking water production wells that resulted from those products. Indeed, despite Manufacturing Defendants own unique knowledge of such hazards, they elected to withhold such knowledge from ACMUA, regulators, and the public; to affirmatively distort and/or suppress their knowledge and the scientific evidence linking their products to such hazards; and to instruct users to release their products directly to the ground where PFOA and PFOS therein could infiltrate drinking water supplies.

95.     Among other things, Manufacturing Defendants breached this duty when they

21

manufactured, marketed, distributed, supplied, and/or sold AFFF products even though they knew or should have known of the dangers that PFOA and PFOS posed to drinking water supplies. Manufacturing Defendants should have known that the manner in which they were manufacturing, marketing, and selling AFFF products would result in and cause contamination of ACMUA's wells.

96.     ACMUA's wells were and are within the area foreseeably exposed to the risk of Manufacturing Defendants' inadequate warnings about their AFFF products. Manufacturing Defendants knew or should have known of the myriad potential release sites and of the rapid mobility and persistence of PFOA and PFOS released to the environment, such that all of ACMUA's wells are susceptible to PFOA and PFOS contamination.

97.     Manufacturing Defendants failed to warn of the hidden dangers associated with their AFFF products before those products left their control, and at all stages of the chain of commerce; at no time relevant to this Complaint did Manufacturing Defendants warn that their products would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases.

98.     As a direct and proximate result of Manufacturing Defendants' failure to warn of the hazards of their AFFF products that were, or reasonably should have been, known to them, ACMUA's wells are contaminated with PFOA and PFOS.

99.     As a direct and proximate result of Manufacturing Defendants' acts and omissions as alleged herein, ACMUA has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its wells in an amount to be proved at trial.

100.     Manufacturing Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS

contamination of ACMUA's wells. Manufacturing Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Manufacturing Defendants knew for decades of the dangers posed by their products. Therefore, ACMUA requests an award of punitive damages for Manufacturing Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. ACMUA requests an award of punitive damages in an amount sufficient to punish these Manufacturing Defendants and that fairly reflects the aggravating circumstances alleged herein.

## FOURTH CAUSE OF ACTION
### Trespass
### (Against Manufacturing Defendants)

101.    ACMUA realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

102.    ACMUA is entitled to exclusive possession of its drinking water production wells.

103.    The presence of PFAS in ACMUA's wells constitutes a physical invasion of ACMUA's property without permission or license.

104.    Manufacturing Defendants are jointly and severally liable for trespass, and continued trespass, because Manufacturing Defendants negligently and recklessly caused PFOA and PFOS to be present in ACMUA's wells as described herein.

105.    As long as ACMUA's wells remain contaminated with PFOA and PFOS due to Manufacturing Defendants' conduct, the trespass continues.

106.    ACMUA is harmed by the presence of Manufacturing Defendants' PFOA and PFOS in its wells, including, but not limited to, by being unable to use contaminated wells; and by incurring expenses in planning for, constructing, operating, and maintaining treatment

infrastructure at contaminated wells.

107.    Manufacturing Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of ACMUA's wells. Manufacturing Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Manufacturing Defendants knew for decades of the dangers posed by their products. Therefore, ACMUA requests an award of punitive damages for Manufacturing Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. ACMUA requests an award of punitive damages in an amount sufficient to punish these Manufacturing Defendants and that fairly reflects the aggravating circumstances alleged herein.

**FIFTH CAUSE OF ACTION**
**Private Nuisance**
**(Against Manufacturing Defendants)**

108.    ACMUA realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

109.    The release and disposal of Manufacturing Defendants' AFFF products have caused an intentional, unreasonable, and negligent interference with ACMUA's use and enjoyment of its private property.

110.    The PFOA and PFOS contamination resulting from the release and disposal of AFFF has proximately caused and continues to cause ACMUA to suffer harm and incur costs and expenses.

111.    The nuisance caused by Manufacturing Defendants is a continuous and substantial interference with ACMUA's right to use and enjoy its property.

24

112.   The nuisance caused by Manufacturing Defendants is capable of being removed and remediated from the site.

113.   Manufacturing Defendants owe a continuing duty to remove and remediate the nuisance and have failed to do so.

114.   ACMU have incurred substantial costs and expenses and will continue to do so to investigate and remediate the PFOA and PFOS contamination.

115.   Manufacturing Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of ACMUA's wells. Manufacturing Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Manufacturing Defendants knew for decades of the dangers posed by their products. Therefore, ACMUA requests an award of punitive damages for Manufacturing Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. ACMUA requests an award of punitive damages in an amount sufficient to punish these Manufacturing Defendants and that fairly reflects the aggravating circumstances alleged herein.

### SIXTH CAUSE OF ACTION
### Recovery of CERCLA Response Costs
### (Against the FAA)

116.   ACMUA realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

117.   The FAA was, at the time when the hazardous substances were disposed of and/or released at the Technical Center, the "owner" and/or "operator" of the Technical Center within the meanings of Sections 101(20)(A) and 107(a)(2) of CERCLA, 42 U.S.C. §§ 9601(20)(A),

9607(a)(2).

118.   The Technical Center is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

119.   The acts and/or omissions of the FAA with regard to the AFFF containing PFAS, including PFOA and/or PFOS and/or compounds that degrade in the environment into PFOA and/or PFOS, constituted a "release" and "disposal" of "hazardous substances" at or from the Technical Center within the meaning of Section 101(14) and (22) and 107(a)(2) of CERCLA, 42 U.S.C. §§ 9601(14) and (22), and 9607(a)(2).

120.   In response to the FAA's disposal and/or releases of hazardous substances at the Technical Center, ACMUA has incurred, and will continue to incur, response costs as defined by Sections 101(25) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(25) and 9607(a).

121.   As of the filing of this Complaint, ACMUA has incurred substantial unreimbursed response costs to treat drinking water contaminated by PFOA and PFOS.

122.   The costs that ACMUA has incurred and will incur are the necessary costs of response and, to the extent required, consistent with the National Contingency Plan, 40 C.F.R. Part 300.

123.   ACMUA did not use AFFF or otherwise cause the release of hazardous substances that polluted its wells with PFOA and PFOS.

124.   Accordingly, the FAA is strictly liable under CERCLA § 107(a), 42 U.S.C. § 9607(a) for all response costs incurred by ACMUA.

**VI.   Prayer**

1.   As to the First, Second, Third, Fourth, and Fifth Causes of Action, Plaintiff ACMUA prays for judgment against Manufacturing Defendants, jointly and severally, for:

26

    a.  Declaratory judgment that Manufacturing Defendants are liable for all costs to investigate, clean up, remove, restore, treat, monitor, and otherwise respond to PFOA and PFOS contamination in ACMUA's wells as described herein and to compensate ACMUA for the lost value and benefits of its wells during all times of injury caused by Manufacturing Defendants' AFFF products, and for such orders as may be necessary to provide full relief to address the risks to ACMUA and its customers;

    b.  Compensatory damages for all injuries ACMUA has incurred and will incur related to past and future investigation, cleanup and removal, treatment, monitoring, and restoration directly or indirectly resulting from Manufacturing Defendants' AFFF products, and their wrongful marketing and promotion thereof; and for all other injuries sustained by ACMUA as a direct and proximate result of Manufacturing Defendants' acts and omissions alleged herein, according to proof, including, but not limited to remedial, administrative, oversight, and legal expenses and compensation for damages to ACMUA's wells;

    c.  Punitive damages in an amount to be determined at trial;

    d.  Costs, expenses, interest, and fees in this action, including reasonable attorney's fees and expert's fees, incurred in prosecuting this action, together with prejudgment and post-judgment interest, to the full extent permitted by law; and

    e.  Such other relief as this Court deems equitable, just, and appropriate.

2.    As to the Sixth Cause of Action, Plaintiff ACMUA respectfully requests that this Court enter a judgment in favor of Plaintiff ACMUA and against Defendant FAA:

a. For all response costs incurred by ACMUA in connection with the AFFF contamination of ACMUA's wells described herein, plus interest accrued.

b. For all future response costs incurred by ACMUA in connection with the AFFF contamination of ACMUA's wells described herein.

c. All costs of this action including attorney's fees;

d. Such other and further relief as this Court may deem appropriate.

## VII. Jury Demand

ACMUA demand trial by jury on all of the triable issues within this Complaint.

Dated:

**RILEY & RILEY LAW OFFICES**

By: _____

Michael Riley

Michael Riley
rileylifrak@aol.com
100 High St. #302
Mt. Holly, New Jersey 08060
Tel:    (609) 914-0300

**SHER EDLING LLP**
Victor M. Sher (*pro hac vice* to be submitted)
vic@sheredling.com
Matthew K. Edling (*pro hac vice* to be submitted)
matt@sheredling.com
Adam M. Shapiro (*pro hac vice* to be submitted)
adam@sheredling.com
Katie H. Jones (*pro hac vice* to be submitted)
katie@sheredling.com
Timothy R. Sloane (*pro hac vice* to be submitted)
tim@sheredling.com

100 Montgomery St., Suite 1410
San Francisco, CA 94104
Tel:    (628) 231-2500
Fax:    (628) 231-2929

*Attorneys for Plaintiff Atlantic City Municipal Utilities Authority*

28